ROBERTS, J.,
for the Court:
¶ 1. On September 7, 2007, Honda Downs and Dr. Peter L. Ackerman were involved in a car accident when Acker-man’s Lexus automobile struck the rear of Downs’s Oldsmobile automobile. Downs suffered injuries as a result of the accident, and she later filed suit against Ack-erman for damages arising out of the accident.[1] Ackerman admitted liability for the accident several times throughout the course of the trial. The jury awarded Downs $20,000 in damages, which were less than the medical bills she presented *812 into evidence as reasonable and necessary medical expenses. Downs filed a motion for a judgment notwithstanding the verdict (JNOV), a motion for a new trial, and, alternatively, a motion for an additur. The circuit judge denied these motions. Downs now appeals.
¶ 2. Central to correct resolution of this case is the issue of whether the amount of the verdict indicated bias, passion, or prejudice on the part of the jury or was against the overwhelming weight of the evidence. Also relevant to proper disposition is an examination of Ackerman’s claim that though Downs’s medical expenses were reasonable and necessary, they were not all proximately caused by Ackerman’s negligence.
PACTS AND PROCEDURAL HISTORY
¶ 3. At 9:30 a.m. on September 7, 2007, Downs was driving on Highway 90 in Jackson County, Mississippi, to make a deposit at Hancock Bank for her employer, the Kellwóod Company. She was stopped at a traffic light when Ackerman’s vehicle struck the rear end of her vehicle. Downs testified the impact was severe, and she estimated Ackerman’s speed at about forty-five miles per hour. Downs was transported by ambulance from the scene of the accident to the hospital at Keesler Air Force Base, where she was examined, x-rayed, and an MRI was conducted.
¶ 4. After several visits with nurse practitioners at Keesler, Downs began seeing Dr. John McCloskey, a neurosurgeon, in June 2008, when she complained of neck pain and tenderness; soreness in the right shoulder and scapular area; constant numbness, tingling, and swelling of her fingers and hands; and visual problems. Dr. McCloskey testified to the following via video deposition: “The three problems that I saw were the posttraumatic neck pain and right shoulder pain; and the visual problems, her posttraumatic visual problems; and, then, I suspected that she had posttraumatic bilateral carpal tunnel syndrome.” He also stated that Downs suffered from discogenic pain, which is “pain from an injured disc in your neck.” Discs “are frequently injured or ruptured with heavy lifting or rear-end auto[mobile] accidents.” Dr. McCloskey attributed Downs’s medical problems to the accident because Downs clearly indicated that she did not have the described injuries and problems prior to the accident. Additionally, he recommended Downs see Dr. Terry Millette, a neurologist and neuro-ophthalmologist, to help explain the vision problems she was experiencing. Dr. McCloskey testified that he last saw Downs in July 2009, and she was still struggling with neck pain, headaches, limitation of motion in her shoulder and neck, pain between her shoulder blades, numbness, tingling and swelling of her hands, numbness of her legs, and significant visual problems. He testified that he believed “within a reasonable medical probability, that Honda Downs suffered permanent injuries.”
¶ 5. Dr. Terry Millette testified via video deposition. According to Dr. Millette, Downs has a “very typical abnormality that patients with a high cervical problem experience.” The abnormality was a “failure to suppress [the] vestibulo-ocular reflex,” resulting in feelings of unsteadiness. He diagnosed Downs with central disequilibrium syndrome and found that this condition is permanent, requiring her to be under the care of a physician for medications and therapy. The purpose of any treatment would be to diminish her symptoms and not “fix” her. He further explained that Downs “has a high cervical injury from extension — flexion, extension phenomenon resulting in damaged disk *813 and facet joints, which cause disequilibrium, chronic head and neck pain, and unsteadiness and secondary muscular spasm, which is sympathetic to the underlying spinal condition.” Like Dr. McCloskey, Dr. Millette also related Downs’s injuries to the accident. Dr. Millette found that Downs should receive a twenty percent impairment rating and that she could attempt to go back to work as the store manager, but it would be difficult for her to maintain gainful employment. On cross-examination, Dr. Millette agreed that prior to Downs’s visits with him, the medical personnel at Keesler’s hospital evaluated her gait as normal and steady; however, in his notes and evaluation, he found Downs was “careful in her ambulation. Which, people with an impaired tandem gait will be careful or appear to be overly cautious at times.” Also on cross-examination, Dr. Millette was questioned on several documents he filled out for GENEX, a company handling Downs’s workers’ compensation claim, approximately a year and a half before trial. In the documents, he indicated that no other diagnostic studies were recommended and that Downs should continue her present medications for treatment purposes. Dr. Millette also indicated that Downs had then reached maximum medical improvement; however, he clarified that maximum medical improvement does not mean that the patient is well, just that the patient has improved to the maximum degree she is capable of improving. The letter also showed that Dr. Millette agreed that Downs could perform her regular work with no restrictions. Lastly, he indicated in the GENEX documents that she was under no impairment. The findings in the GENEX documents appeared to contradict what Dr. Millette had testified to in his trial deposition with regard to Downs’s future treatment and ability to work.
¶ 6. Finally, Dr. Terry Smith also testified via .video deposition, and his ultimate conclusion was that the treatment Downs received was necessary and reasonable based upon her injuries and symptoms.
¶ 7. Prior to the beginning of trial, both parties agreed that all Downs’s medical bills and records would be introduced into evidence; however, Downs objected to the introduction of three GENEX documents in the voluminous stack of medical bills and records. As was explained above, the GENEX documents contained information regarding Downs’s medical information that were filled out by Dr. Millette. In favor of having the documents introduced into evidence, Ackerman argued that the documents should be allowed because they fell within the business-record- exception to the hearsay rule found in Mississippi Rule of Evidence 803. He elaborated by stating that the documents are a basis for Dr. Millette’s opinions regarding Downs’s injuries and treatment, and the jury should have the opportunity to have the documents in front of them during deliberations. Downs countered Ackerman’s argument on the ground that the documents were not a record made at the time of treatment or kept in the regular course of business and were not properly authenticated. Downs further stated that the documents were “[i]n fact, ... a summary asking questions and responding to questions from an outside person as to this patient’s care and treatment.” Further, Downs argued that Dr. Millette had been asked about these documents at his deposition; therefore, these documents would be duplicative, which could lead to jury confusion. Downs also had concerns with the references to workers’ compensation made on the documents. For example, the documents refer to Downs as a “claimant” and the Kellwood Company as her “employer.” The documents consistently refer to the accident as the “work injury”; inquire into *814 her possible “work status”; refers to her maximum medical recovery; and also ask for a percentage of Downs’s impairment. Although not explicitly stated, Downs ultimately argued that pursuant to Mississippi Rule of Evidence 403, the documents should have been excluded because the “probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or ... needless presentation of cumulative evidence.” The circuit judge allowed the GENEX documents into evidence.
¶ 8. Downs filed suit against Ackerman on May 1, 2009, for damages arising out of the accident. In her complaint, Downs sought to recover her past and future medical expenses, past and future lost wages, pain and suffering, and mental and emotional distress. An agreed order was entered on September 28, 2010, allowing Sentry Insurance Company, Downs’s employer’s workers’ compensation carrier, to intervene to protect its subrogation claim which then exceeded $30,000. Downs’s presented $20,800.30 in medical bills and approximately $10,500 in past lost wages at the trial held in the Jackson County Circuit Court, which began on October 19, 2010, and ended on October 20, 2010. Although Downs did not claim any property loss, both vehicles suffered significant damage. The collision caused $7,363.87 worth of damage to Downs’s Oldsmobile and over $10,000 worth of damage to Ack-erman’s Lexus. Downs and Robert, her husband, also testified at trial concerning the impact the accident has had on their daily lives. Downs testified that, prior to the accident at issue, she had never been in a car accident. Both Downs and Robert ■indicated that Downs had become increasingly withdrawn and rarely enjoyed time out with her friends since the accident. They described this sort of behavior as quite a contrast from Downs’s life before the accident. Valerie Yager, Downs’s friend and former co-worker, also testified to the changes in Downs’s personality since the accident and confirmed that she and Downs were no longer close as a result of the accident. Ackerman was also called as an adverse witness where he described his involvement in causing the accident, and he admitted liability for the accident. In his opening statement, Ack-erman’s attorney stated, “[Ackerman] accepts responsibility for this accident.... And we understand that there are consequences ... from an act of negligence-” Again, in Ackerman’s attorney’s closing argument, it was reiterated that “[Ackerman] accepted responsibility for causing the accident ... [and Acker-man] also accepts responsibility for the consequences that flow from causing that accident.” Ackerman did not call any witnesses nor present any evidence in his case in chief. Both sides rested, jury instructions were read, and closing arguments were heard. Specifically, the jury was given an instruction that the verdict should be returned in the following form:
We, the jury, find for the Plaintiffs and assess their damages as follows:
Honda Downs.
$-
Robert Downs.
$-
¶ 9. The jury began deliberations, and during deliberations, the jury sent three questions to the circuit judge: Did Dr. Ackerman have insurance?; How much did insurance pay toward medical bills?; Of the amount of medical bills not covered by car insurance, what were the out-of-pocket expenses? The circuit judge responded with the following written statement: ‘You are not to concern yourself with these issues. You are to concentrate on the evidence and testimony presented at trial. *815 Continue to deliberate.” The jury returned a general verdict in proper form awarding Downs $20,000 in damages and Robert $0.00 in damages. Feeling aggrieved by the jury’s verdict, Downs filed a motion for a JNOV, a motion for an addi-tur, and, alternatively, a motion for a new trial. After a hearing on the post-trial motions held on December 16, 2010, the circuit judge denied Downs’s motions. Downs perfected the current appeal.
¶ 10. On appeal, she raises the following two issues:
I. Whether the circuit court erred in allowing the GENEX documents, which reference a collateral source, into evidence if the sole purpose of the documents was to impeach a witness.
II. Whether allowing the GENEX documents into evidence led to confusion and bias among the jurors resulting in such an inadequate award of damages that judicial intervention is necessary.
STANDARD OF REVIEW
¶ 11. When reviewing a circuit judge’s decision to admit or deny evidence, the standard of review this Court employs is abuse of discretion. Istiphan v. City of Madison, 81 So.3d 1200, 1206 (¶ 13) (Miss.Ct.App.2012) (quoting Walker v. State, 55 So.3d 212, 216 (¶ 14) (Miss.Ct.App.2011)). This Court also employs the abuse-of-discretion standard when it reviews a circuit court’s denial of a motion for a new trial or additur. Upchurch ex rel. Upchurch v. Rotenberry, 761 So.2d 199, 206 (¶ 26) (Miss.2000) (quoting Harvey v. Wall, 649 So.2d 184, 187 (Miss.1995)).
ANALYSIS
¶ 12. In her brief, Downs argues that the circuit court erred in failing to grant her motion for an additur because the jury’s verdict of $20,000 did not adequately compensate her for her medical bills, lost wages, future medical treatments, or pain and suffering. An additur or remittitur may be granted pursuant to Mississippi Code Annotated section 11 — 1— 55 (Supp.2011), which states the following:
The supreme court or any other court of record in a case in which monetary damages were awarded may overrule a motion for a new trial or affirm on direct or cross[-]appeal, upon condition of an addi-tur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of the credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only.
Also relevant in this case is Mississippi Code Annotated section 41-9-119 (Supp. 2011), which states “[pjroof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable.” An “opposing party may, if desired, rebut the necessity and reasonableness of the bills by proper evidence.” Jackson v. Brumfield, 458 So.2d 736, 737 (Miss.1984). At trial and without objection, Downs produced her medical bills totaling $20,800.30. She also provided testimony through Dr. Smith that the medical bills presented were necessary and reasonable for the treatment of her injuries and symptoms. Further, both Dr. Millette and Dr. McCloskey testified that the accident was the cause of Downs’s injuries because she had never complained of the symptoms prior to the accident. On appeal, Downs asserts that Ackerman failed to offer any contradictory evidence *816 as to the injuries she sustained and that mere cross-examination of her medical experts, standing alone, is insufficient to rebut a prima facie showing of necessary and reasonable medical bills. Under the facts as presented in this record, we agree.
1113. In 2000, this Court found in Hubbard v. Canterbury, 805 So.2d 545, 549 (¶ 11) (Miss.Ct.App.2000), that because Samuel Hubbard submitted $4,094.53 in medical bills, there was prima facie evidence to support a finding that the medical bills were reasonable and necessary; however, Rose Canterbury could rebut this evidence by presenting proper evidence. We found that Canterbury only relied on her own testimony and the argument that she impeached Hubbard’s and Hubbard’s expert witnesses’ testimonies to rebut the necessity and reasonableness of treatment. Id. at 550 (¶ 17). The case was affirmed on the condition that Hubbard accept a $1,592.53 additur; if Hubbard declined, a new trial on damages was ordered to be held. Id. at 551 (¶ 17). Because Hubbard is factually similar to the current case, we apply the same analysis. In the current case, Ackerman relied only on the cross-examination of Downs’s expert witnesses to rebut the prima facie evidence that her medical bills were necessary or reasonable. Ackerman asserts that he successfully disputed much of Downs’s treatment by impeaching her experts on cross-examination, which resulted in a jury verdict for less than Downs’s total medical bills. Our review of the record does not indicate that reasonable and fair-minded jurors could have concluded that Downs’s reasonable and necessary medical expenses were not causally related to the car collision. At trial, Ackerman did attempt to elicit testimony from Downs’s expert witnesses that Downs’s injuries could have resulted from lifting heavy boxes at work; however, there was very minimal testimony presented to show that this activity, as opposed to the accident, was a proximate cause of her injuries. Like in Hubbard, Ackerman relied solely on his attempts to impeach the expert witnesses when making his case to rebut the prima facie evidence presented; his evidence was insufficient to rebut that Down’s medical bills were reasonable and necessary to treat her injuries proximately caused by the accident.
¶ 14. Additionally, in Hubbard, 805 So.2d at 549 (¶ 9), this Court found that “[ejvidence of bias, prejudice, or passion may be inferred by contrasting the amount of damages with the amount of the verdict.” In that case, the jury awarded Hubbard $2,500 even though he presented $4,094.53 in medical bills. This Court found that this discrepancy indicated bias, passion, or prejudice. The supreme court has held similarly when presented with cases in which a jury awarded less than the uncontested damages. See generally Maddox v. Muirhead, 738 So.2d 742 (Miss.1999); Brown v. Cuccia, 576 So.2d 1265 (Miss.1991); Jackson v. Brumfield, 458 So.2d 736 (Miss.1984). Also, there is evidence of juror confusion in this case when the jury asked multiple questions during its deliberations regarding what amount of money insurance provided for Downs’s medical bills and how much was out-of-pocket expenses. This seems to indicate the confusion in determining an appropriate award to compensate Downs for her injuries and damages since the jurors may well have concluded that she had already been compensated for her medical expenses and lost wages from another source. Based on the evidence in this record, we are compelled to conclude that the jury’s verdict in favor of Downs for only $20,000 is against the overwhelming weight of the credible evidence and does not adequately compensate her for all of her claimed damages.
*817 ¶ 15. It is incumbent on us that we recognize the very recent supreme court decision of Thompson v. Nguyen, 86 So.3d 232 (Miss.2012), in which a similar issue involving motions for an additur or a new trial were addressed. Karen Thompson was stopped at a red light when the vehicle behind her driven by Dung Thi Hoang Nguyen bumped into her rear bumper. Id. at (¶2). Neither car was damaged, and neither Thompson nor Nguyen complained of any injuries. Id. Several days after the accident, Thompson complained of neck pain, so she visited her physician who prescribed pain medication and physical therapy. Id. at (¶ 3). An MRI showed a preexisting degenerative-disc disease associated with disc bulges. Id. at (¶ 4). Approximately three years after the accident, Thompson underwent surgery to treat the abnormal discs. Id. She then filed suit against Nguyen to recover $234, 316.49 in damages. Id. At trial, Thompson explained that her symptoms began after the accident and caused her to suffer daily debilitating neck pain. Id. at (¶ 5). Thompson also presented the testimony of her physician Dr. James Martin, who “admitted that Thompson had preexisting disc disease, but testified that — to a reasonable degree of medical certainty — -Thompson’s injuries were ‘caused or at least aggravated by the accident.’ ” Id. at (¶ 6). Also, Thompson’s neurosurgeon testified her symptoms were related to the accident. Id. However, her doctors also testified that they knew nothing about the circumstances of the accident, such as the speed of and damage to the vehicles. Id. at (¶ 7). They also acknowledged that Thompson’s migraines and degenerative disc disease existed prior to the accident and related to the same discs Thompson complained are injured by the accident. Id. At the end of trial, a jury awarded Thompson $9,131, which was the exact amount of her physical-therapy bills. Id. at (¶ 10). The circuit judge denied Thompson’s motions for addi-tur or new trial, and this Court reversed and remanded the case for a trial on damages, finding that the jury was confused because they only deliberated for three- and-a-half hours and asked the circuit judge several questions during deliberation. Id. at (¶ 19). The supreme court took the case on certiorari and found this Court erred in reversing and remanding for a new trial; it affirmed the circuit court’s denial of Thompson’s motions for additur or new trial. Id. at (¶ 33). The jury asked the circuit judge the following five questions during deliberations:
1. Can we see the police report?
2. Were the transcripts of the videos entered into evidence? If yes, we do not have them.
3. Can we have a dictionary (preferably medical)?
4. We feel we have too much information to fully and reasonably make a decision[;] is there any chance that we can return tomorrow?
5. Can we speak with you, the judge, in private? Do we need to write two statements?
Id. at (¶ 20). Based on those questions, the supreme court found that there was no confusion on the part of the jury’s award; therefore, the circuit judge did not abuse his discretion in failing to grant Thompson’s motions for an additur or new trial. Id. at (¶21). Additionally, the supreme court disagreed with this Court’s finding that since the verdict was only four percent of the requested damages then the verdict was a result of bias, passion, or prejudice. Id. at (¶ 22).
¶ 16. While we acknowledge the supreme court’s holding, the ease before us, we believe, is factually distinguishable from Thompson. In the current case, the jury asked several questions relating to *818 insurance and the amount of damages insurance had paid on behalf of Downs’s medical bills. As was stated above, the jury’s questions much more strongly indicate their confusion as to how to award damages since they should not have been considering any collateral sources of compensation available to Downs. The contested GENEX documents were before the jury in the jury room, and the jury was fully aware that Downs was injured while in the scope of her employment with Kell-wood; therefore, workers’ compensation was also available to help cover the costs of the accident. Further, the actual accident in the current case was more severe as was demonstrated in the pictures of Downs’s vehicle and Ackerman’s vehicle introduced at trial. Downs had to be extracted from her damaged vehicle by ambulance personnel. Further, Downs was transported from the scene of the accident to the hospital via ambulance, as opposed to Thompson, who did not see a doctor until several days after the accident. This was not a mere “fender bender” impact as was the circumstance in Thompson. Downs presented her medical bills totaling $20,800.30 as prima facie evidence that her medical bills were reasonable and necessary. These, as well as other facts, distinguish the current case from the holding in Thompson; therefore, we find Thompson inapplicable in this instance. Downs’s case provides a much stronger indication that based on the weight of the evidence and the jury’s confusion, a motion for an addi-tur or a new trial on damages should have been granted.
¶ 17. Because of our finding that the circuit judge abused his discretion in failing to grant Downs’s motion for an additur or her motion for a new trial, we reverse and remand this case for the circuit judge to grant an appropriate, suggested addi-tur. If either of the parties fails to accept the additur granted by the circuit court, a new trial on damages shall be held. See Dedeaux v. Pellerin Laundry, Inc., 947 So.2d 900, 909 (Miss.2007); Davis v. Walters, 54 So.3d 272, 279 (Miss.Ct.App.2010).
¶ 18. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, MAXWELL, RUSSELL AND FAIR, JJ„ CONCUR. BARNES, J„ CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. Robert Downs, Downs’s husband, was involved in the original suit, as he filed a loss of consortium claim. He was awarded no damages at trial, and he is not involved in this appeal.